624 So.2d 1267 (1993)
Larry and Laura THERIOT, et al., Plaintiffs-Appellants,
v.
Dean LASSEIGNE, et al., Defendants-Appellees.
No. 92-903.
Court of Appeal of Louisiana, Third Circuit.
September 22, 1993.
*1268 Edmond L. Guidry, III, St. Martinville, for Larry J. Theriot et al.
Terry L. Rowe, Lafayette, for Dean Lasseigne et al.
Alex Andrew Lopresto, III, Lafayette, for Travis Courville.
Shepton F. Hunter, Lafayette, for Teche Bank & Trust Co.
Charles E. Soileau, Rayne, for State, DOTD.
Before DOUCET, YELVERTON and COOKS, JJ.
COOKS, Judge.
This is a left turn accident case which essentially presents four issues for our review: (1) whether the configuration of the intersection, where the accident occurred, posed an unreasonable risk of harm to a left turning motorist considering the special facts of this case; (2) whether the State Department of Transportation and Development (DOTD) breached its duty to maintain the intersection in a reasonably safe condition; (3) whether the oncoming and the left turning motorists' combined negligence served as the sole causes of the accident or whether the negligence of DOTD contributed to the mishap; and (4) whether DOTD had actual or constructive knowledge of the dangerous *1269 road condition as required by La.R.S. 9:2800. Although the trial judge found the intersection's configuration together with the movement of preceding and oncoming traffic presented "a cone of obscurement" which created a risk to left turning motorists; he, nevertheless, concluded this risk was not unreasonable. We disagree and reverse the trial court's judgment, additionally finding that DOTD had actual knowledge of the defective condition and its failure to remedy or reduce the risk of harm was a concurrent cause-in-fact of the accident.
The accident occurred during the early morning when Travis Courville, driving a Honda Prelude, and attempting to negotiate a left turn at the intersection of Main and Bridge Streets in St. Martinville, collided with an oncoming pickup truck operated by Dean Lasseigne. The configuration of the intersection is shown on the sketch reproduced below as found in the record:

Main Street's travel lanes do not continue in a straight pattern across Bridge Street. Instead, Main Street is substantially offset at its intersection with Bridge Street. The centerline of Main Street north of its intersection with Bridge Street lies approximately fifteen (15) feet west of the centerline of Main Street south of its intersection with Bridge Street. A driver proceeding south on Main Street desiring to turn left on Bridge *1270 Street must compensate for this centerline differential by first negotiating his vehicle in an easterly direction before perfecting the left turn. While visual obscurements exist on virtually all highways from the movement of preceding vehicles, buildings, darkness, fog, poles, bushes, or other vision impediments, plaintiffs urge this normal phenomena was unreasonably exacerbated by the misalignment of Main Street. As depicted in the sketch, Main Street's offset is so substantial that drivers, traveling north and south looking initially straight ahead, are unable to see oncoming traffic. They first must reposition their vehicles by maneuvering a considerable distance (left or right respectively) into the viewing path of approaching traffic. During this maneuvering phase, the oncoming vehicle may be momentarily hidden from the approaching driver's view. Also, a left turning motorist increased. Likewise, the distance and time required for a left turning motorist to clear the intersection are greater than normal. As a result, left turning motorists may not compensate sufficiently for the excessive speed of an approaching vehicle or the additional time required to safely perfect the greater distance turn. This case factually turns on these added variables which plaintiffs conclude made the intersection of Main and Bridge Streets unreasonably dangerous on the night of the accident. We agree.
Minutes before the 2:00 a.m. collision, Dean Lasseigne left a local lounge headed north on Main Street. Travis Courville, joined by several friends in his Honda Prelude, left a local bandstand eventually heading south on Main Street.[1] Two vehicles preceded Travis through the intersection. Lasseigne testified he simply did not see Travis' vehicle or lights until a split second before the accident. Travis insisted when he decided to make a left turn at the intersection, no headlights or vehicles were visible. Before Travis could complete the turn, the Honda Prelude collided with Lasseigne's pickup truck causing it to veer in the direction of a building striking a brick support column. One of the passengers in the Honda Prelude, Jarrod Courville, died as a result of the accident. The other passengers were severely injured.
Several defendants were named in the ensuing personal injury litigation, including the drivers, the City of St. Martinville, Teche Bank (the owner of the building struck by the Honda Prelude), their respective insurers, and DOTD. The parties were able to partially resolve the case by prior settlement leaving only the Drivers and DOTD as defendants at trial. By agreement, the case was bifurcated on the issues of liability and damages. The trial judge assigned sixty (60%) percent fault to Travis, forty (40%) percent fault to Lasseigne, and dismissed the claims against DOTD. This appeal followed.
Although plaintiffs assigned two errors for review, our holding makes it unnecessary to address the second assignment attacking the constitutionality of 23 U.S.C. *1271 § 409 which prevents trial admission of any "reports, surveys, schedules, list or data compiled" for safety enhancement purposes by DOTD as a voluntary participant in the federal funded highway scheme. Main and Bridge Streets are Federal Aid Highways. Plaintiffs argue the exclusion of this evidence strips Louisiana of its fundamental right to adopt laws and assign civil responsibility to protect its citizens from unsafe road conditions and to force disclosure of such hazards through access to public records. Without question, litigants have a more difficult task proving, unaided by any presumption, roadway defects when DOTD elects to exclude all data or other documents gathered and in its possession which speak to the issue. This proof battle intensifies when a plaintiff is required additionally to show DOTD had prior knowledge of the defective condition. However, we are not called, here, to visit this evidentiary pitfall. We find the trial judge manifestly erred in concluding albeit the intersection posed a risk to left turning motorists, the risk was not unreasonable. The evidence in the record preponderantly points to a finding that the intersection was unreasonably dangerous and DOTD breached a legal duty owed to these plaintiffs.
Dr. Olin Dart, an expert in the fields of traffic engineering, highway design, traffic safety and accident reconstruction, testified both the northbound and southbound vehicles are prevented from seeing the approaching traffic because of the misalignment of the intersection until the vehicles are sixty (60) to eighty (80) feet from the intersection. He confirmed a southbound left turning motorist may visually determine that "a clear shot" exists to make the turn "seeing nothing coming;" and he may commit to making the turn, leaving only two seconds clearance time as the approaching vehicle becomes visible and arrives at the intersection, provided the northbound vehicle was traveling at the posted twenty-five (25) miles per hour speed limit. This clearance time substantially decreases depending on the excessive speed of the approaching vehicle. Dr. Dart concluded the intersection was unreasonably dangerous in normal use considering existing circumstances, particularly noting a southbound motorist may be lulled into commencing an unsafe left turn at Bridge Street. Dr. Dart suggested to reduce or alleviate the risks facing a left turning motorist, DOTD could construct a left turn lane and realign the oncoming traffic to enhance straight line visibility at the intersection. He estimated the cost of the proposed adjustment would total approximately One to Two Thousand Dollars. Dr. Dart also suggested that DOTD could change the light synchronization to different phases at Port Street and Bridge Street which would reduce the speed of northbound vehicles at the misaligned intersection.
DOTD presented the testimony of Dr. Ned Walton, an expert in traffic-highway design-human engineering and accident reconstruction. Dr. Walton does not dispute the misalignment of the intersection caused vision obscurement to approaching southbound and northbound motorists depending on the position of their vehicles. He differed, however, on the cause of the accident which he solely attributed to driver error. In his opinion, the accident resulted from Lasseigne's driving at an excessive speed and Travis' failure to yield the right of way or to remain stationary until he could evaluate whether it was safe to make the turn. His chief objection to Dr. Dart's proposed solution, admittedly reducing vision obscurement at the intersection, hinged on the difficulty such configuration might pose to WB-50 vehicles and to allocated parking spaces in the area.
The trial judge found a "zone of obscurement" did exist at the intersection which was affected by vehicles preceding the southbound left turning motorist. "Although it does create a risk of harm," he reasoned "it [was not] unreasonable." His conclusion seemingly rested on the finding that the obscurement constantly changed and within seconds it disappeared depending on the position of the preceding and oncoming vehicles. He placed the onus entirely on the motorist to wait at the intersection "a few seconds more" or "lean to the left" before determining whether it is safe to make a left turn. This additional burden runs afoul of left turning motorists' reasonable expectations and the legal responsibility imposed on them versus DOTD.

*1272 LAW AND ANALYSIS
Granted, left turning motorists must yield to oncoming traffic "within the intersection or so close thereto as to constitute an immediate hazard." LSA-R.S. 32:122; LSA-R.S. 32:101 and 104. A left turn is extremely dangerous and great care must be taken by a motorist to assure a clear distance exists between the intersection and approaching traffic to effect the turn. We acknowledge, as well, that drivers additionally have a duty to operate, control, and use their automobiles reasonably, and to maintain proper lookout for hazards which might pose an unreasonable risk of harm. Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App.2d Cir.1987), writs denied, 505 So.2d 61 (La. 1987). However, the added responsibility which a motorist must assume to protect himself from known dangers does not operate to fully excuse DOTD from its statutory obligation to maintain our state highways, under its care and control, in a reasonably safe condition. The pertinent inquiry is whether the fault of each party contributed to the accident and whether each party breached a duty to guard against the particular risk encountered. Louisiana's comparative fault scheme, as statutorily implemented, requires a trier of fact to determine the degree of fault, equated in percentage values, attributable to each party in casting liability.

DUTY
DOTD has a duty to maintain the highways and shoulders in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Holmes v. State, Through Dept. of Highways, 466 So.2d 811 (La.App. 3rd Cir.1985), writ denied, 472 So.2d 31 (La. 1985). This duty "extends to the protection of those people who foreseeably may be placed in danger by an unreasonably dangerous condition." Gadman v. State Through D. of Transp. & Dev., 493 So.2d 661, 666 (La.App. 2nd Cir.), amended in part, 497 So.2d 1001 (La.1986); Sinitiere v. Lavergne, supra; Holmes v. State, Through Dept. of Highways, supra. The present suit against DOTD is grounded on both negligence and strict liability theories of recovery. Under either theory DOTD's duty is the same. Kent v. Gulf States Utilities, 418 So.2d 493 (La.1982). DOTD may fulfill its duty by taking steps to eliminate or reduce the risks associated with the dangerous condition or it may post adequate warnings of the danger. More important to our present inquiry, DOTD owes this duty to imprudent drivers as well. Gadman, supra, Burge v. City of Hammond, 494 So.2d 539 (La.1986). Our shared experiences teach drivers are not always attentive and they do exceed the speed limits. When "the fault of a motorist and the fault of a governing body responsible for warning motorists against unusually dangerous road hazards combine to produce an accident, comparative negligence is applicable." Gadman, supra; Veazey v. Parish of Avoyelles, 476 So.2d 1057 (La.App. 3rd Cir., 1985), writ denied, 478 So.2d 1238 (La.1983); Ledbetter v. State Dept. of Transp. and Dev., 482 So.2d 1035 (La.App. 3rd Cir.), writ granted, 487 So.2d 432 (La.1987).

UNREASONABLE RISK OF HARM AND NOTICE
The standard for determining whether a particular road condition is unreasonably dangerous is not easily ascertainable by reference to any jurisprudential formula or axiomatic rule. Entrevia v. Hood, 427 So.2d 1146 (La.1983). In Landry v. State of Louisiana and the Board of Levee Commissioners of the Orleans Levee District, 495 So.2d 1284, 1287 (La.1986), the Louisiana Supreme Court made clear:
"`the unreasonable risk of harm criterion... is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code. Since Articles 2317 and 2322 are not detailed rules for all concrete cases, it becomes the interpreter's duty to decide which risks are encompassed by the codal obligations from the standpoint of justice and social utility.'... Reaching an intelligent and responsible decision of whether a risk is unreasonable involves consideration of moral, social, and economic values as well as the ideal of justice."
*1273 Thus, the reasonableness of a particular roadway which poses a risk to the motoring public must be assessed by reverting to a consideration of the gravity of harm presented, the utility of the thing, the cost of correcting or reducing the risks, and societal rights, obligations, expectations and values. Kent v. Gulf States Utilities, supra. This approach necessarily requires a search for what is right and just in a society which places certain primary responsibility on its public bodies to protect them from harm's way.
The record clearly supports a finding that the subject intersection presented an unreasonable risk to drivers. DOTD's expert acknowledged that an obscurement to view existed at the intersection of Main and Bridge Streets which was more pronounced than normal and which presented additional risks to left turning motorists compounded by the movement of preceding vehicles. His opinion, regarding the cause of the accident, rested on placement of blame for the mishap entirely on the conduct of the oncoming and left turning motorists. His ultimate assignment of fault did not result from any finding based on the laws of physics or mathematics. An expert's approach to fault finding, which is not scientifically rooted, should not supplant the flexible, unbiased, and reasoned analysis articulated by our courts in assessing delictual responsibility in such cases. Rather, we find the testimony of Dr. Olin Dart more persuasive and corroborated by several public officials' complaints filed with DOTD regarding numerous prior accidents at the intersection. Because of the intersection's configuration and other physical obstructions in the area, including the movement of preceding vehicles, Dr. Olin Dart testified a driver may be lulled into thinking the oncoming lane is free of approaching traffic. As confirmed by Dr. Dart, a driver may misjudge the threat of an approaching vehicle which is not visible at a distance greater than sixty to eighty (60-80) feet from the intersection. Further, the distance a left turning motorist perceives as safe may be affected, appreciably, by the speed of the approaching vehicle and the greater road distance the driver must cover to perfect the turn. DOTD's responsibility to the motoring public also entails anticipating that, on occasions, drivers will exceed the speed limit at this intersection, thereby increasing the admitted hazard. Moreover, Dr. Dart testified the intersection was unreasonably dangerous even if the approaching vehicle obeyed the speed limit. Given a left turning motorist even under ideal conditions has only seconds to perfect the turn, any hesitation he makes completing the maneuver or the slightest change in the approaching vehicle's speed may result in an accident.
This accident occurred on December 2, 1989. On July 16, 1987, former Senator Oswald Decuir, addressed a letter to Mr. Bill Fontenot, a design engineer employed by DOTD at its Lafayette district office, memorializing his earlier conversation as follows:
"I am writing as a follow up to our recent conversation regarding my request to investigate realigning the curve at the intersection of La. 31 (Main Street) and La. 96 (Bridge Street) in St. Martinville. As I mentioned, it is almost impossible to make a left turn from Main Street to Bridge Street at this intersection; and there have been numerous accidents.
I would appreciate it if you could give me an update on this matter at your earliest possible convenience ..."
A copy of the letter was forwarded to St. Martin Parish Sheriff, Charles Fuselier, who Senator Decuir testified had requested his assistance in apprising DOTD of the misalignment of Main and Bridge Streets and the reoccurrence of accidents at this site. On July 21, 1987, DOTD's District Administrator, Mr. W.C. Vincent, responding to the Senator's letter expressed:
"This will acknowledge receipt of your letter dated July 16, 1987, referring to a conversation with our Mr. Bill Fontenot concerning the realignment of the intersection of Louisiana 31 and Louisiana 96 in St. Martinville.
On the surface, this request would appear to be a very costly one to accomplish because of the probable amount of property damage which would result to existing buildings located at this intersection. We will nevertheless review the possibility of *1274 making a realignment of this location after which time we will advise you of our recommendations concerning this request."
A copy of this communication was forwarded to Sheriff Fuselier and to Mr. Bill Fontenot with the following notation: "Mr. Fontenot: Please have survey and topography Map made at this location in order that we may determine if this is feasible." In early 1989, prior to the accident, Mr. Eugene Waguespack (chief of the Lafayette district office for DOTD) met with St. Martinville's Mayor, Earl Willis, who expressed his "concerns for the intersection of Main and Bridge Street and the possibility of realignment." The Mayor also informed Mr. Waguespack that the building at the northeast corner of the intersection was owned by him and it would not pose a problem to the State presumably if it desired to appropriate this site.
Relying on the federal exemption contained in 23 U.S.C. § 409, DOTD continuously objected to any testimony which may have been elicited from its employees or data gathered, including accident reports, resulting from its investigation of the misalignment of Main and Bridge Streets and its findings, if any, regarding the hazardous nature of the intersection.
As it stands, we believe the record reflects that the number of prior accidents which occurred at the intersection were sufficiently high to alert the Sheriff, the Mayor, and a local Senator that a problem existed at the intersection which presented a possible hazard to motorists. In furtherance of their commitment to public service, they addressed their concerns to DOTD. DOTD did not dispute the occurrence of multiple accidents at the intersection. Rather, it sought to exclude the admission of all accident reports, as hearsay evidence, and to remain mute. We believe the evidence strongly supports a finding that the vision obscurement acknowledged by DOTD's and plaintiffs' experts played a role in this accident.
Furthermore, DOTD's stated reason for failing to take any steps to eliminate or reduce the risk posed by the misalignment of Main and Bridge Streets pales when compared to the gravity of harm likely to result as a consequence of the defect. DOTD contends it did not immediately seek to realign Main and Bridge Streets because of the substantial costs associated with acquiring nearby property and federal restrictions placed on the use of historic property. Accepting DOTD's representations as credible, we are not convinced these obstacles prevented DOTD from taking alternative action designed to reduce or eliminate the danger posed by the intersection's misalignment. As suggested by Dr. Olin Dart, DOTD could have constructed a left turn lane and rerouted the traffic at the intersection or it could have changed the synchronization phases of the lights at Port and Bridge Streets to reduce traffic speed. The magnitude of the risk and the likelihood of harm are too great to justify placing blame entirely on drivers, although they have a concomitant duty to guard against known dangers. The possible inconvenience caused to heavy utility truck drivers, required to make wide angle turns, at the intersection or to persons desiring to park in the area is hardly measurable against loss of human life or serious bodily injury. We find the intersection of Main and Bridge Streets was unreasonably dangerous and DOTD had actual knowledge of the defect.

CAUSATION
To establish causation, plaintiff is only required to show that "more probable than not, the accident would not have happened but for [DOTD's] negligence." Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3rd Cir.1981), writ denied, 410 So.2d 760 (La.1981), cert. denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). While Travis could have proceeded with greater caution in attempting a left turn at the intersection, the evidence does not support the conclusion that his negligence was the sole cause of the accident. Neither are we convinced that the excessive speed of Lasseigne's vehicle served as an intervening act sufficient to negate DOTD's negligence as a concurrent cause of the accident. If DOTD had constructed a left turn lane and redirected traffic at the intersection, straight line visibility would have improved substantially and "more probable than not" Travis would have seen Lasseigne's approaching vehicle in *1275 time to make a safe choice on whether to perfect a left turn or both drivers would have seen the others approaching vehicle in time to take evasive action. Even if DOTD had elected simply to change the light synchronization at Port and Bridge Streets, "more probable than not" the accident would not have happened because the speed of Lasseigne's vehicle would have been reduced.

ALLOCATION OF FAULT
In assessing fault, the trier of fact is required to consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967 (La.1985). The Supreme Court, in Watson, at 974, further explained:
"In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
The trial judge assessed forty (40) percent fault to Lasseigne and sixty (60) percent fault to Travis. On review of damages, we are limited to lowering the award against any party to the highest point we would have affirmed on appeal. Coco v. Winston Industries Inc., 341 So.2d 332 (La. 1976). We will not disturb the trial court's allocation of fault against Dean Lasseigne. The trial court's fault assessment is a factual determination subject to the clearly erroneous standard of review. The record does not demonstrate the trial judge was clearly wrong in assigning forty (40) percent fault to Lasseigne. However, the trial court erred in finding Travis sixty (60) percent at fault. As discussed, we recognize a motorist desiring to turn left must guard against known hazards and yield the right of way to approaching vehicle. While the record convinces us that Travis could have exercised greater caution at the intersection (which he should have known posed a danger) the "obscurement to view" and other problems presented to a motorist attempting to make a left turn, militates against the trial court's assessment of fault against Travis Courville. The highest award reasonably taxable on appeal to Travis Courville's negligence is thirty (30) percent. The percentage balance is assigned to DOTD, weighing the gravity of harm posed to drivers by its failure to correct a known defect and the severe consequences of the breach.
Accordingly, the lower court's judgment is reversed to cast liability against DOTD and amended to fix the fault of Travis Courville and DOTD as follows:
IT IS ORDERED, ADJUDGED AND DECREED judgment is rendered in favor of the plaintiffs against the State of Louisiana, through the Department of Transportation and Development, finding it thirty (30) percent at fault in causing the accident;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the judgment is amended to reduce the percentage of fault assigned to Travis Courville to thirty (30) percent.
Further, the case is remanded to the trial court for a determination of damages and rendition of judgment consistent with the above apportionment of fault. All costs on appeal are assessed against DOTD.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART; RENDERED; AND REMANDED.
NOTES
[1] The record contains testimony revealing that both drivers had departed from local establishments serving or permitting the consumption of alcohol, and both drivers admitted they consumed several beers during the night. However, Lercy James Melancon, a St. Martinville Police Officer, who arrived on the scene only a short time after the accident, confirmed he did not smell alcohol on the breaths of the drivers. Several passengers in the Honda Prelude also testified Travis was not intoxicated at the time of the accident. No experts were called to establish whether alcohol may have impaired the ability of the drivers to operate their vehicles on the night of the accident. To prove negligence on the part of a person who has admittedly consumed alcoholic beverages prior to operating a vehicle, there must be a showing that the person's mental and physical faculties were materially impaired at the time of the accident. Shroyer v. Grush, 555 So.2d 534 (La.App. 4th Cir., 1989); Jones v. Continental Casualty Co. of Chicago, Ill., 246 La. 921, 169 So.2d 50 (La.1964). There is no statutory presumption of intoxication in civil cases. Lemire v. New Orleans Public Service, Inc., 538 So.2d 1151 (La.App. 4th Cir., 1989), writ denied 542 So.2d 1383 and 543 So.2d 2 (La.1989). Additionally, a defendant must show the causal relationship between the alcohol consumption and the accident. Whittington v. American Oil Co., 508 So.2d 180 (La.App. 4th Cir., 1987), writ denied, 512 So.2d 436 (La.1987). In his reasons for judgment, the trial judge did not mention this evidence obviously electing to disregard it. Likewise, this court finds DOTD simply failed to establish the drivers' mental and physical faculties were impaired at the time of the accident and such impairment contributed to the accident.